**LOTTE TRADING CO., LTD., Plaintiff,**

v.

**B.S.P.G. INCORPORATED, Defendant.**

No. 95 CIV.1973 (WK).

United States District Court,
S.D. New York.

April 21, 1999.

Y. David Scharf, McDermott, Will & Emery, New York City, for plaintiff.

Frederick C. Stern, New York City, for defendant.

## OPINION & ORDER

WHITMAN KNAPP, Senior District Judge.

Plaintiff seeks to recover $447,879 (plus interest) alleged to be due and owing under a series of contracts arranged by it to finance shipments of imported clothing to defendant. Before us is plaintiff's motion for partial summary judgment as to its first and third claims for breach of contract. Plaintiff represents that in the event it is successful on the instant motion, it will withdraw its second claim, obviating the need for trial.

### BACKGROUND

Defendant is a New Jersey corporation which imports clothing from Asia for resale in the United States. Plaintiff is a Korean trading company that is part of a large conglomerate. In briefs and affidavits relating to the instant motion, two widely contrasting pictures emerge of the relationship between plaintiff, defendant, and two other players.

At the core of the dispute are so called "documents against acceptance" ("D/A") contracts. These contracts, which are attached as Exhibits A–C to plaintiff's moving brief, appear to be traditional contracts

for the sale of goods naming plaintiff as the seller and defendant as the buyer. Plaintiff, however, characterizes the D/A contracts as agreements by which plaintiff extended credit to defendant.

According to the plaintiff, in or about 1993 defendant sought to import men's clothing from Shin Wha Co. Ltd., a Korean manufacturing company which produced the goods at issue in this matter. Defendant and Shin Wha negotiated the terms of the sale and import of the clothing, but Shin Wha would not consummate the transaction without a Korean letter of credit. Since defendant could not obtain a letter of credit from a Korean bank on its own account, it looked elsewhere for financing. Plaintiff agreed to provide the requisite financing.

Plaintiff, defendant, and Shin Wha thereafter entered into an arrangement that is evidenced in the D/A contracts. Under the D/A contracts, Shin Wha manufactured the clothing with the security of a letter of credit posted by plaintiff on defendant's behalf. Upon defendant's receipt of the clothing, it was to pay plaintiff (within 120 days) the price of the clothes and an additional finance charge of 2% of the value of the goods. In essence, defendant received 120 days of credit in exchange for a 2% mark-up on the cost of the clothes.

In accordance with the three-party arrangement, from September 1993 through May 1994 plaintiff opened letters of credit with a Korean bank on defendant's behalf, naming Shin Wha as the beneficiary. At the same time, it executed various D/A contracts with defendant. Shin Wha manufactured the goods and shipped them according to defendant's specifications while drawing funds from plaintiff's letters of credit. Eventually, disputes arose over various shipments of clothing that defendant claimed to be nonconforming. Defendant received the goods but failed to pay

plaintiff for amounts due on three of the D/A contracts. Of the $447,879 owed on the D/A contracts, defendant apparently concedes liability on all but $200,000. It has informed plaintiff that it will not pay any amounts due under the D/A contracts until issues relating to the non-conforming clothing are resolved.

Plaintiff predicates its summary judgment motion on the theory that it, as a financing agent, must be paid despite defendant's asserted defense that Shin Wha's goods were nonconforming. In other words, the financing must be paid because defendant's only remedy is against Shin Wha.

Defendant's position, on the other hand, is that plaintiff was not a "financing agency" at all but merely a merchant and the seller of the goods at issue. Defendant asserts that plaintiff is in the business of manufacturing and exporting a wide variety of goods;[1] and that plaintiff solicited the defendant with the hope of selling imported clothing. Defendant maintains that it had done substantial business in Korea and did not need plaintiff's financial support or credit to do business; that it had never done any business with Shin Wha prior to being contacted by plaintiff; and that it was the plaintiff who selected Shin Wha as the manufacturer. *See Affidavit of Hyug Kuoo Kwon* at ¶ 4 ("The selection of Shin Wah to manufacture the goods was soley [sic] the act of Lotte.").

According to the defendant, plaintiff negotiated the price, quantity and other terms with Shin Wha and arranged for import. Defendant characterizes the D/A contract as nothing more than an ordinary contract of sale between itself and plaintiff with extended payment terms. *See Defendant's Brief* at 5 ("It is the position of Mr. Kwon, who negotiated the contract with Lotte's New York office, that he was buying goods from Lotte. He was not seeking

---

1. Plaintiff responds to this contention by pointing out that while Lotte Trading Company is affiliated with a group of companies (some of which manufacture and export), it is an independent entity which does not do either.

from Lotte a guarantee of payment to Shin Wah because he didn't even know of Shin Wah at the time."). Finally, defendant denies the existence of any tri-partite arrangement between it, plaintiff, and Shin Wha.

The question before us, then, is whether the evidence in the record establishes either account or whether such evidence is inconclusive—thus leaving open a question of fact.

## DISCUSSION

### A. What factors differentiate a financing agency from a seller?

The Uniform Commercial Code defines a "financing agency" as follows:

> [A] bank, finance company or other person who in the ordinary course of business makes advances against goods or documents of title or who by arrangement with either the seller or the buyer intervenes in ordinary course to make or collect payment due or claimed under the contract for sale, as by purchasing or paying the seller's draft or making advances against it or by merely taking it for collection whether or not documents of title accompany the draft. "Financing agency" includes also a bank or other person who similarly intervenes between persons who are in the position or seller and buyer in respect to the goods...

NY UCC § 2–104(2).

▮ Two decisions in this district consider the meaning of that statute. *See In re Sherwood Diversified Services, Inc.*, 382 F.Supp. 1359 (S.D.N.Y.1974) (Werker, J.); and *J.P. Marks International, Inc. v. Corema S.A. Empresa De Comercio E Exportacao and Republic National Bank of New York*, 1985 WL 2046 (S.D.N.Y. July 24, 1985) (Keenan, J.). Both stand for the proposition that distinguishing between a financing agency and a seller involves examining the respective negotiating positions of each of the parties rather than screening contracts to see how parties are referenced.

In *Sherwood*, the court observed that "the proper method for analyzing the transactions in question is to 'look through' the form of the agreement and to examine the intent of the parties and the facts and circumstances which existed at the time of the agreements." 382 F.Supp. at 1363–64 (citation omitted). Ultimately, Sherwood (the intermediary whose status was at issue) was deemed to have been a financing agency and not a seller. Factors there deemed relevant included the following: (1) the equipment ordered by the purchaser was shipped directly to them by the manufacturer; (2) Sherwood would remit the full sales price to the manufacturer; (3) the purchaser had often placed orders with the manufacturer prior to approaching Sherwood; (4) Sherwood did not select or inspect any of the equipment; (5) UCC financing statements were executed and delivered to the purchasers and filed by Sherwood; (6) the agreements were almost always discounted with a bank or other lending institution; (7) the monthly payments were calculated to return to Sherwood the purchase price, sales tax, interest and filing fees; (8) Sherwood did not maintain a warehouse for the storage of machinery and equipment; (9) Sherwood did not carry the property as assets on its books but rather as accounts receivable; and (10) Sherwood had never taken possession of any of the equipment at the end of the leased term. *Id.* at 1364.

In *Marks*, upon facts similar to those before us, Judge Keenan distilled the *Sherwood* factors into the four most relevant: (1) the equipment ordered was shipped directly to the purchasers by the manufacturers; (2) the defendant (Sherwood) did not select or inspect any of the equipment; (3) the defendant did not maintain a warehouse for the storage of the equipment; and (4) the defendant never took possession of any of the equipment at the end of a lease term. 1985 WL 2046 at *5. Inasmuch as the *Marks* inquiry

arose in the context of a TRO hearing, the court ultimately deferred its findings until after a full evidentiary hearing could be held.

Although we are in no way bound by those decisions, we are persuaded that they are correct, and are particularly impressed by Judge Keenan's distillation of the significant factors in *Marks*.

### B. Which version of the facts is substantiated by documentary evidence?

■ We note at the outset, in considering Judge Keenan's distillation in *Marks*, that there is no suggestion in the record before us (other than in defendant's uncorroborated affidavit) that plaintiff: (1) ordered any equipment from the manufacturer; (2) ever selected or inspected any of the equipment; (3) maintained a warehouse for the storage of equipment; or (4) took possession of any equipment at the end of a lease term. Accordingly, in reliance upon *Marks*, we can safely ignore the fact that plaintiff's name did appear on shipping documents; "such appearance was more than likely attributable to the need to conform shipping documents to the letter[s] of credit." *Marks*, 1985 WL 2046 at *5. Moreover, as far as we can determine, the written correspondence between the parties clearly suggests that they both regarded plaintiff as a financier and not as a seller.

Defendant's attempt to suggest an opposite conclusion is almost wholly based on the affidavit of its principal as to what he and everyone else said or thought at the time. While such recollections are certainly admissible evidence, we are satisfied that if all the evidence before us were presented at trial, we would be compelled to grant plaintiff's motion for a verdict in its favor.

### CONCLUSION

■ Based on the foregoing, it would seem appropriate to grant plaintiff's motion. However, one circumstance disturbs us. Each party is represented by an attorney not originally involved in the case. Plaintiff's present attorney had nothing to do with drafting the complaint and found himself disadvantaged by some of its allegations. Defendant's attorney, on the other hand, did not become involved until after discovery had been complete and several times during oral argument expressed the feeling that relatively simple additional discovery could strongly support his position.

Accordingly, we reserve decision on the motion and direct plaintiff, within 30 days of entry of this order, to file a new complaint setting forth its present understanding of the cause of action. Defendant is directed, within 30 days of receiving such complaint, to report to us in writing what additional discovery it deems to be appropriate and useful at this stage of the proceedings. Upon receipt of defendant's report, we will set a status conference to determine what further proceedings would be appropriate.

**SO ORDERED.**